AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

SEALED

In the Matter of the Search of
2340 South Madison Avenue
Yuma, Arizona 85364.

Case No.    22-9103 MB

(Filed Under Seal)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 924(a)(1)(A) | False Statement During the Purchase of a Firearm |

The application is based on these facts:

**See attached Affidavit of Special Agent Angelica Carpenter**

☒ Continued on the attached sheet.
☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Addison Santome

ADDISON SANTO Digitally signed by ADDISON SANTO
Date: 2022.04.26 13:50:35 -07'00'

_Applicant's Signature_

Angelica Carpenter, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives
_Printed name and title_

Sworn to before me and signed electronically.

Date:  4/27/2022@12:15pm

_Judge's signature_

City and state: Phoenix, Arizona

Honorable Eileen S. Willett, U.S. Magistrate Judge
_Printed name and title_

## ATTACHMENT A

*Property to be searched*

The property to be searched is 2340 South Madison Avenue, Yuma, Arizona 85364, including the residence, curtilage, outbuildings, and appurtenances. This property is further described as a single-story residential home with multi-colored brick, a brown roof, and brown trimming. The front of the residence faces East, on the West side of South Madison Avenue. The residence is enclosed by a chain-link fence with a single car driveway on the South of the property. The driveway extends to the rear of the residence, which is an open area with a couple of sheds, and back access to an alleyway. One of the sheds is a large, enclosed brick structure and the other shed is a small metal one located in front of the large one.



This requested search shall include all vehicles present at **Subject Premises** at the time of execution of the search warrant that are either

(1) Registered to Santiago CORPUS BARRANCAS and/or Monica Lua; or,

(2) Associated to **Subject Premises** either by the presence of keys inside **Subject Premises** or documentation.

# ATTACHMENT B

*Property to be seized*

1.  Any and all firearms and/or firearm parts, including revolvers, pistols, rifles, shotguns, lower receivers, machineguns, silencers, and destructive devices;

2.  Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, firearms, ammunition, and firearm parts or accessories;

3.  Any documents, records, receipts, notes, ledgers, invoices, and any other documentation related to the acquisition, transportation, ordering, purchase, sale, or distribution of firearms, ammunition, or firearm parts and accessories;

4.  Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, computer disks, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in illegal firearms and ammunition sales;

5.  Records, items, and documents reflecting travel for participating in firearms trafficking conspiracy, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, rental vehicle receipts, canceled checks, maps and written directions to locations;

6.  Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, electronic money transfer services, check or money order purchase receipts, account statements, and any other records reflecting the receipt, deposit, or transfer of money;

7.  Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

8. Indicia of occupancy, residency, rental, ownership, or use of the **Subject Premises,** and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

9. Paraphernalia related to the acquisition, transportation, use, or distribution of firearms, ammunition, and/or firearms parts and accessories, including boxes, packaging materials, shipping labels, and storage containers;

10. Computers, cellular telephones, tablets, and other media storage devices, such as thumb drives, CD-ROMs, DVDs, Blu Ray disks, memory cards, and SIM cards (hereafter referred to collectively as "digital devices"), and any records and information found within:

   a. tending to indicate efforts to acquire, possess, transport, or sell firearms;

   b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to indicated efforts to acquire, possess, transport, or sell firearms;

   c. tending to identify co-conspirators, criminal associates, or others involved in efforts to acquire, possess, transport, or sell firearms;

   d. tending to identify travel to or presence at locations relevant to efforts to acquire, possess, transport, or sell firearms;

   e. tending to identify the user of, or persons with control over or access to, the subject phone; or

      f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

11.    Records evidencing ownership or use of digital devices, including sales receipts, registration records, and records of payment.

The seizure and search of digital devices shall follow the procedures outlined in the supporting affidavit.  Deleted data, remnant data, slack space, and temporary and permanent files on the digital devices may be searched for the evidence above.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Angelica K. Carpenter, being first duly sworn, hereby deposes and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 2340 South Madison Avenue, Yuma, Arizona 85364 (hereinafter the "**Subject Premises**"), and any vehicles found thereon during the execution of the warrant, as further described in Attachment A. This application is requested in order to search for and seize the items outlined in Attachment B, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below.

2.  Your Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and has been since September 2015. Prior to becoming a Special Agent, your Affiant completed her formal training at the Federal Law Enforcement Training Center (FLETC), in Glynco, Georgia. Your Affiant completed both the Criminal Investigator Training Program and Special Agent Basic Training. In both programs, your Affiant received specialized training in various aspects of federal law enforcement. Your Affiant is currently assigned to the Los Angeles Field Division, El Centro Field Office where she is assigned to investigate violent crimes and firearms trafficking primarily along the southwest border.

3.  Pursuant to Title 18, United States Code (U.S.C.), Section 3051, your Affiant is empowered to enforce the criminal laws of the United States. She has previously participated in and conducted criminal investigations pertaining to firearms trafficking, narcotics trafficking, and other violations of federal law. Over the course of her employment with ATF, she has participated in the use of cooperating informants/ defendants, undercover agents, physical surveillance, audio surveillance, and search

warrants, among other law enforcement techniques. Many of these investigations have resulted in arrests, searches, and seizures of individuals and property.

4.     The facts in this Affidavit are based on your Affiant's investigation, your Affiant's training and experience, the investigation of other agents and law enforcement officers, and information obtained from witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of your Affiant's knowledge about this investigation.

5.     Based on the fact set forth in this Affidavit, your Affiant's training and experience, and in consultation with other experienced investigators, there is probable cause to believe that violations of 18 U.S.C. § 924(a)(1)(A), False Statement during the Purchase of a Firearm, have been committed by Santiago CORPUS BARRANCAS (hereinafter "BARRANCAS"). Additionally, there is probable cause to believe that evidence of these crimes will be found at the **Subject Premises**.

## CURRENT INVESTIGATION

6.     In January 2022, investigators became aware of BARRANCAS due to two (2) Firearm Trace Summaries (FTS) showing BARRANCAS was the original purchaser of two (2) pistols which subsequently were recovered in crimes in Mexico. One (1) pistol showed a time-to-crime of 237 days and the other showed a time-to-crime of 332 days. Both FTS's showed that BARRANCAS had acquired the firearms from Federal Firearms Licensees (FFLs) *Sprague's Sports* and *Sportsman's Warehouse*, respectively. Both FFLs are located in Yuma, AZ.

## ATF Form 4473

7.     Based on this information, records checks were conducted on BARRANCAS' firearm purchases in the Yuma, AZ area. Your Affiant received ATF Form 4473's, Firearm Transaction Records, for BARRANCAS' purchases from *Sportsman's Warehouse*, *Sprague's Sports*, and *CAL-Ranch*. These forms showed that BARRANCAS purchased the following firearms on their respective dates:

a. *July 22, 2020 – Stoeger, model STF-9C, 9 millimeter (mm) pistol bearing serial number T6429-20S00444 from *Sportsman's Warehouse*.

    i. Recovered in Tijuana, Baja California, Mexico on June 19, 2021, by law enforcement officials.

b. *February 27, 2021 – Taurus, model G2C, 9 mm pistol bearing serial number ACB509586 from *Sprague's Sports*.

    i. Recovered in Mexicali, Baja California, Mexico on October 22, 2021, by law enforcement officials

c. March 6, 2021 – Sarsilmaz, model B6, 9 mm pistol bearing serial number T1102-21E50363 from *CAL-Ranch*.

d. March 6, 2021 – Diamondback, model DB15, 5.56 mm rifle bearing serial number DB2463346 from *CAL-Ranch*.

e. *April 26, 2021 – Sarsilmaz, model SAR9PT, 9 mm pistol bearing serial number T1102-19BV06810 from *Sprague's Sports*.

f. *August 20, 2021 – Sarsilmaz, model SAR9, 9 mm pistol bearing serial number T1102-21BV82241 from *Sportsman's Warehouse*.

g. *November 16, 2021 – Taurus, model G3, 9 mm pistol bearing serial number 1KA19413 from *Sportsman's Warehouse*.

h. *December 12, 2021 – Sarsilmaz, model K2 45, .45 caliber pistol bearing serial number T1102-21Y00492 from *Sportsman's Warehouse*.

8.    In total, BARRANCAS spent approximately $3,680.00 on firearms, ammunition and firearm accessories.

9.    Additionally, for each of the ATF Form 4473's, BARRANCAS listed his residential address to be "1916 South 11th Avenue, Yuma, AZ", hereafter referred to as the 11th Avenue address.

<strong>Attempted Contact at 11th Avenue Address</strong>

10.    On February 23, 2022, Agents attempted to contact BARRANCAS at the 11th Avenue address. Agents met the homeowner, Aurora Ortiz Patena (hereafter referred to as

"Patena"), who stated BARRANCAS did not reside there and only her immediate family members resided at the residence with her.

11.    The homeowner stated she had been residing there since 1994. The homeowner further stated that BARRANCAS did receive mail there but never picks up the mail. The homeowner stated BARRANCAS had a previous arrangement with her late husband solely to utilize the address for mail. The homeowner knew BARRANCAS to reside in Yuma, AZ but could not provide any further details.

12.    Through my training and experience, I know that it is a violation of federal law for any person who knowingly makes a false statement or representation with respect to the information required by federal law to be kept in the records of the holder of a federal firearms license (FFL) according to Title 18, U.S.C., § 924(a)(1)(A).

### Contact with BARRANCAS

13.    On March 5, 2022, BARRANCAS crossed into the United States through the San Luis Port of Entry in a white Chevrolet suburban that is registered to Monica Lua (hereinafter "Lua"). The vehicle is register to Lua using the **Subject Premises** address. During contact with CBP Officers, BARRANCAS shared with them the vehicle is registered to his significant other.

14.    On March 24, 2022, Agents attempted to contact BARRANCAS at the **Subject Premises**. Agents met with the BARRANCAS' girlfriend, Monica Lua (hereinafter "Lua") who is also the mother of BARRANCAS' children. Lua told Agents she has resided at the address for approximately two (2) years, that BARRANCAS has resided there for approximately one (1) year with her, but that she recently kicked BARRANCAS out due to them fighting. Lua claimed to not know where BARRANCAS was staying but indicated he may be staying with his father or boss.

15.    Lua told agents that "Ms. Patena", had contacted her letting her know law enforcement was looking for BARRANCAS.

16.    Lua would not provide the Agents with any other information regarding BARRANCAS, besides a telephone number.

17. After Agents left, they learned that Lua had called the Yuma Police Department (YPD) to verify whether the Agents were in fact ATF Agents. Your Affiant returned to the residence with a YPD officer in order to re-contact Lua. During this contact, Lua was on the telephone with BARRANCAS who then agreed to meet at YPD for a voluntary interview.

18. BARRANCAS and Lua arrived at YPD together and were both in the interview room when Agents began to interview BARRANCAS.

19. The Agents asked BARRANCAS where he was currently residing, to which he stated he sometimes stays with Lua at the **Subject Premises** and sometimes at 11th Avenue address. BARRANCAS claimed he had not paid rent, was no longer staying at 11th Avenue address, and had stopped residing there approximately one (1) month prior. BARRANCAS claimed he resided in a small room at the back of the residence.

20. The Agents then informed BARRANCAS that one of the firearms he purchased, the aforementioned firearm listed as "**a.**", was recovered in a crime in Mexico. Agents simply asked BARRANCAS if he could recall what he did with the firearm, as most FTS's are the result of one or multiple private party transfers.

21. BARRANCAS claimed to have all his firearms, became defensive, and insisted he did not have any firearms in Mexico. Agents informed BARRANCAS that lying to federal Agents was a federal felony and that this was his opportunity to be honest. BARRANCAS insisted he had all of his firearms and stated they were at his "house". The Agents asked BARRANCAS which "house" he was referring to, but BARRANCAS would not answer the question.

22. BARRANCAS then stated he wanted to talk to his lawyer and did not want to continue answering any questions. BARRANCAS claimed he did not know what was going on, but stated he understood that one of his firearms was recovered in Mexico.

23. Agents did not get a chance to inform or ask BARRANCAS about the second FTS, for the aforementioned firearm listed as "**b.**".

**Second Contact with 11th Avenue Address**

24. Immediately after the interview on March 24, 2022, Agents returned to the 11th Avenue address to speak with the homeowner, Patena, again. Agents met with Patena and her adult son, who again indicated that BARRANCAS never resided there, nor paid any kind of rent.

25. Agents took pictures confirming there is not a small room in the back of the residence.

26. Patena's adult son stated he owns a landscaping business and employs BARRANCAS. Department of Economic Security records confirm BARRANCAS does work for a "J & Y Palm" which is associated with the 11th Avenue address.

27. Per Patena's son, BARRANCAS has been working for him for five (5) years. He knows that BARRANCAS currently resides off Madison Avenue, and has so for approximately two (2) years. Prior to that BARRANCAS resided in the *Donovan Estates* residential area for approximately a year or more. Your affiant knows this residential area to be located between West 8th Street and County 8 ½ Street, to the West of Avenue C in Yuma, AZ.

28. When asked whether Patena or her son know Lua, her son stated that he knows Lua is dating BARRANCAS, but his mother does not know her. Patena denied ever contacting Lau, but she did tell BARRANCAS in person after the agents came looking for him.

**BARRANCAS Reports Firearms Stolen**

29. On March 25, 2022, your Affiant learned that BARRANCAS had called YPD shortly after the consensual interview on March 24, 2022, to report his firearms being stolen from the **Subject Premises** by an unknown individual sometime between September 1, 2020, and March 24, 2022.

30. BARRANCAS provided YPD with the receipts for his stolen firearms, which were identified as the aforementioned firearms "a.", "b.", and "e.-h." (also notated above by an asterisk).

31. BARRANCAS reported to YPD that he had kept the firearms, which were stolen, in an unlocked shed in the rear of his residence. BARRANCAS showed YPD officers in

person a small, unlocked plastic container in which he claimed to have had his firearms on his property at **Subject Premises**. BARRANCAS could not provide an exact date to YPD officers as to when he last saw the firearms. BARRANCAS claimed it had been approximately a year, despite the fact that half of BARRANCAS' purchases were made within the last year.

32. BARRANCAS told YPD officers that he was still in possession of firearms, which were secured in a locked closet in his bedroom. BARRANCAS only identified one of the firearms as being a rifle and unlocked the closet for YPD officers to take photographs for their report. BARRANCAS claimed that he kept most of his firearms outside due to Lua not wanting them inside of the residence. In addition, BARRANCAS admitted to YPD officers he had been residing at the **Subject Premises** for approximately two (2) years.

33. BARRANCAS' statement that he resided there for two (2) years would place him at the residence during the time of the majority of the firearms purchases. Additionally, he told law enforcement the firearms are at **Subject Premises**.

34. Record checks for firearms purchases by Lua showed that on October 18, 2018, Lua purchased a Bersa, model Thunder 380, .380 caliber pistol bearing serial number H79024 from *Sportsman's Warehouse*, utilizing the address "8338 South Apache Lane, Yuma, AZ". Your Affiant knows this address to be located in the aforementioned *Donovan Estates* residential area, which corroborates the information provided to Agents by the resident of 11th Avenue address.

35. Based on the evidence and BARRANCAS statements, it appears BARRANCAS has resided at **Subject Premises** for the majority of the firearm purchases. Through my training and experience as an ATF SA, your Affiant has learned that individuals who possess or own firearms and ammunition routinely store these weapons in their residence for easy access and safekeeping.

36. If BARRANCAS is still in possession of any firearms illegally acquired from an FFL, the firearms can be seized for forfeiture due to the false statements on ATF Form 4473 as set forth in 18 U.S.C. § 924(d)(1).

37. Through my training and experience, your Affiant has learned that records showing indicia of occupancy, residence, and/or dominion over a residence such as utility bills, sales receipts, forms of identification, mail, and other documents routinely exist at a residence where the occupant lives and are retained for long periods of time.

38. Through my training and experience, your Affiant knows that persons often store records, digital devices, firearms, ammunition, firearms parts and accessories, narcotics, cash, financial instruments, and other assets in vehicles they own either in the passenger compartment or in the vehicle's trunk/cargo area.

### Contact with Subject Premises Landlord

39. On April 25, 2022, Agents contacted the homeowner and then ultimately the property manager, Danielle McConnaughay (hereinafter "Ms. McConnaughay"), of the Subject Premises. Ms. McConnaughay stated they have rented Subject Premises to Monica Lua for approximately three (3) years. Approximately six (6) months ago, repairs needed to be completed at the property and Ms. McConnaughay learned another adult male has been residing there.

### Surveillance Footage at Sportsman's Warehouse

40. Additionally, your Affiant reviewed video surveillance footage provided by *Sportsman's Warehouse* for BARRANCAS' purchase of a pistol on December 16, 2021, identified as firearm "h". In this video, BARRANCAS is seen entering and exiting the store with a male, identified as BARRANCAS' father, Santiago Corpus Perez (hereinafter "Perez").

41. A check of Perez's criminal history record revealed that Perez is a multi-convicted felon. Perez has been convicted of Importation of Controlled Substance, Importation of Marijuana, and Transportation of Aliens for Financial gain, all federal convictions.

42. In the surveillance video, Perez is seen handling a firearm inside of the store while BARRANCAS is completing his purchase of a firearm. Firearm "h" was one of the firearms that BARRANCAS has now claimed stolen in the YPD report.

43.    During Agent's contact with Lua at the **Subject Premises**, Lua contacted Perez multiple times to inform him that Agents were there and looking for BARRANCAS. Additionally, the vehicle Lua and BARRANCAS arrived in at YPD for the consensual interview was a California plated vehicle registered to Perez.

44.    Through my training and experience as an ATF SA, your Affiant knows it is unlawful, pursuant to Title 18, U.S.C. § 922(g)(1), for a person who has been previously convicted in any court for a crime punishable by imprisonment for a term exceeding one year to possess any firearm or ammunition that has moved in interstate commerce.

45.    Given Perez's criminal history, he would be prohibited from possessing firearms and ammunition.

46.    Through my training and experience as an ATF SA, your Affiant has learned that individuals who cannot legally possess firearm utilize the tactic of utilizing a person who can legally possess the firearm to straw purchase the firearm on their behalf—the individuals who purchase firearms on behalf of another person are referred to as "straw purchasers". Your Affiant also knows from his experience as an ATF SA that straw purchasers often are compensated monetarily for their efforts by the person who has recruited them to straw purchase the firearm. Your Affiant also knows that making a false statement to an FFL material to the acquisition of a firearm is a violation of Title 18, U.S.C. § 922(a)(6).

47.    Your Affiant also knows that pursuant to Title 18, U.S.C. § 922(d)(1), it is unlawful for any person to dispose of any firearm or ammunition to a person knowing or having reasonable cause to believe the person receiving the firearm is under indictment or has been convicted of a crime punishable by a term of imprisonment exceeding one year. Hence, your Affiant knows that the various categories of persons prohibited from possession of firearms and ammunition that have moved in interstate commerce as set forth in Title 18, U.S.C. § 922(g)(1)-(9) generally acquire their firearms through private party transactions and through straw purchasers as any attempted purchase of a firearm through a business

that holds an active FFL will require a query of FBI NICS which, based upon their criminal history, will result in the denial of the purchase.

<strong>Surveillance at Subject Premises</strong>

48.    On April 25, 2022, your Affiant conducted surveillance at **Subject Premises**. Around 7:30 in the morning, your Affiant observed BARRANCAS exit Subject Premises, enter a white truck, and leave the residence. Your Affiant also observed another unknown male wait outside the residence and enter the work truck with BARRANCAS before he left the residence.

49.    On April 26, 2022, SA Vincent Cahill with Homeland Security Investigation (HSI) conducted surveillance at **Subject Premises**. SA Cahill observed a subject matching BARRACAS description around 7:00 in the morning exit the residence and walk between the vehicles and the residence. Ultimately, the subject left the residence around 7:08 with two female children.

<strong><ins>II. ITEMS TO BE SEIZED</ins></strong>

50.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found at the **Subject Premises**.

51.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

      a. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to keep those and other firearms and documents related to the acquisition and disposition of those firearms at their residence, business, and in their vehicles for an indefinite period of time.  Even after firearms are sold, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions, record the status of the accounts receivable and accounts payable, and maintain the names, telephone

numbers, and contact information for suppliers, customers, and co-conspirators.

b. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to store those firearms at places other than their residences, such as in their vehicles or storage facilities. However, those persons often maintain receipts or other documentation related to those firearms and storage locations in their residences, businesses, and vehicles.

c. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to conduct those transactions in cash and store the United States Currency (USD) at their residence or vehicle.

d. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to possess items relating to those firearms, including associated magazines, photographs of firearms and receipts for the purchase of these items at their residence and at places other than their residence, such as their place of business, their vehicles, storage lockers, and sheds. These same individuals also carry on their person, inside clothing pockets or a wallet, receipts for the purchase and repair of those items.

e. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms, to carry those firearms on their person, particularly handguns and rifles equipped with a folding stock or telescoping stock, which due to their inherent size, can be easily carried and concealed on their bodies.

f. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to go through surreptitious means to acquire, maintain and possess such firearms without complying with state and federal laws. These same individuals often maintain the names, addresses, and telephone numbers of individuals from whom they illegally acquire or transfer firearms to, at their residences, businesses, on their cellular devices,

on their person in a wallet or pocket, or in their vehicles. Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the **Subject Premises**.

g. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to change their address on state-issued documents (i.e.: Driver License, State Identification Card, Vehicle Registration, etc.), often days prior to a firearm purchase, in an effort to circumvent suspicion of an unlawful firearm acquisition.

h. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to obtain firearms from associates who are not prohibited from purchasing or possessing firearms. These associates are known as "straw purchasers." The "straw purchaser" buys a firearm in his/her own name and subsequently transfers the firearm to the prohibited person. Firearms recovered by law enforcement with a Time-to-Crime under 365 days, are typically a strong indicator of "straw purchases" and/or firearms trafficking tendencies.

i. It is common for individuals who are involved in the illegal acquisition and/or trafficking of firearms to obtain firearms from states known to law enforcement agents as "source states" such as Arizona, Nevada, and Texas. "Source states" typically have less restrictive firearms laws than other states that allow gun buyers to purchase multiple handguns in a single transaction in addition to assault style rifles. Typically, these individuals are "straw purchasers" who obtain several firearms from a "source state", which are then transported to the states or countries where it is more difficult or illegal to obtain certain firearms, such as California or Mexico.

j. It is common for individuals involved in firearms trafficking to use cellular telephones, computers, tablets, and personal digital assistants (collectively "Digital Devices") and maintain these items on their person and/or in their

residences.    Individuals involved in firearms trafficking use these Digital Devices to increase their mobility, coordinate illicit activities, and to provide the traffickers with instant access to phone calls and voice messages. Digital Devices enable firearm dealers to maintain contact with associates, suppliers, and customers.  Individuals often utilize Digital Devices with photograph and video capabilities to take photographs and videos of other members of criminal organizations, firearms, criminal proceeds, and assets purchased with criminal proceeds.  Therefore, evidence related to the illegal acquisition and/or trafficking of firearms is likely to be found on electronic storage media found at the **Subject Premises**, as further described below.

k. It is common for individuals involved in firearms trafficking to obliterate serial numbers and other manufacturer's markings from firearms to thwart law enforcement attempts to trace the origin and identity of firearms.

52.    In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Subject Premises**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## III. DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

53.    As described in Attachment B, this application seeks permission to search for records that might be found in or on the **Subject Premises**, in whatever form they are found, including data stored on a computer, cellular telephone, tablet, or other media storage device, such as a thumb drive, CD-ROM, DVD, Blu Ray disk, memory card, or SIM card (hereafter collectively referred to as "electronic storage media").  Thus, the warrant applied for would authorize the seizure of all electronic storage media found in or

on the **Subject Premises** and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

54.   *Probable cause.*  Your Affiant submits that if electronic storage media are found in or on the **Subject Premises**, there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on such media, for at least the following reasons:

55.   Your Affiant knows that when an individual uses certain electronic storage media, the electronic storage media may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic storage media is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic storage media is also likely to be a storage medium for evidence of crime.  From my training and experience, your Affiant believes that electronic storage media used to commit a crime of this type may contain: data that is evidence of how the electronic storage media was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

56.   Based on my knowledge, training, and experience, your Affiant knows that electronic storage media contain electronically stored data, including, but not limited to, records related to communications made to or from the electronic storage media, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

57.   Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they

have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

58.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

59.    As previously set forth in this Affidavit, the targets of this investigation have used social media via their cellular telephones to send messages, photographs and information with instructions and/or regarding specific information related to the illegal acquisition of firearms. Therefore, your Affiant believes that evidence of criminal activity will be found on any electronic storage media found at the **Subject Premises**, and that the electronic storage media constitute instrumentalities of the criminal activity.

60.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the electronic storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be found on any electronic storage media located in or on the **Subject Premises** because:

61.    Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and

processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

62.     As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the owner. Further, activity on an electronic storage medium can indicate how and when the storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information

stored within electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on an electronic storage medium may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the existence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera) not previously identified. The geographic and timeline information described herein may either inculpate or exculpate the user of the electronic storage medium. Last, information stored within an electronic storage medium may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

63. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

64. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one electronic storage medium is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

65.     Further, in finding evidence of how an electronic storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

66.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

67.     *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine electronic storage media to obtain evidence.  Electronic storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

68.     *Technical requirements.*  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present

on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic storage media off-site and reviewing it in a controlled environment allows for a thorough examination with the proper tools and knowledge.

69.    *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of electronic storage media formats that may require off-site reviewing with specialized forensic tools.

70.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

71.    Because several people share the **Subject Premises** as a residence, it is possible that the **Subject Premises** will contain electronic storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those electronic storage media, the warrant applied for would permit the seizure and review of those items as well.

## IV. CONCLUSION

42.    Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 924(a)(1)(A), False Statement during the Purchase of a Firearm, which are likely to be found at the **Subject Premises**, which is further described in Attachment A.

_Angela Carpenter_
Special Agent Angelica K. Carpenter
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Subscribed and sworn to before me telephonically this ___27___ day of __April__, 2022.

_EswiIlett_
HONORABLE DUTY EILEEN S. WILLETT
United States Magistrate Judge